**DOREAU v. MARSHALL, Secretary of State.**

**No. 9556.**

United States Court of Appeals
Third Circuit.

Argued May 6, 1948.

Decided Aug. 23, 1948.

O'CONNELL, Circuit Judge, dissenting.

---

* The rule reads: "If, in switching, the signals are lost to view, stop must be made until signals can again be seen."

William H. S. Wells and Maurice B. Saul, both of Philadelphia, Pa. (Saul, Ewing, Remick & Saul, of Philadelphia, Pa., on the brief), for appellant.

James P. McCormick, of Philadelphia, Pa. (Gerald A. Gleeson, U. S. Atty., of Philadelphia, Pa., on the brief), for appellee.

Before McLAUGHLIN and O'CONNELL, Circuit Judges, and LEAHY, District Judge.

McLAUGHLIN, Circuit Judge.

Appellant sued under Section '503 of the Nationality Act of 1940, 54 Stat. 1171, 8 U.S.C.A. § 903, for a judgment declaring her to be a national of the United States The complaint was dismissed with prejudice. From the judgment entered this appeal was taken.

The complaint alleges, among other things, that appellant is over twenty-one and that her permanent residence in the United States is in the City of Philadelphia, Pennsylvania. She was born in New York City of American born parents and was an American citizen at the time of her marriage in 1933 to a French citizen. She retained her American citizenship and was issued an American passport as late as May 26, 1941. In April 1939 she last left the United States and was residing with her husband in France at the time of the occupation of that country by the Germans in June 1940.

She says that in January 1941 she was advised by the American Consul at Paris that in the likely event of war between the United States and Germany she would run the risk of internment in a concentration camp and that therefore she should leave France and return to the United States, if possible. She thereupon went to the Vichy zone in the south of France with the intention of returning to the United States. Her United States passport was renewed by the American consul at Marseilles on May 26, 1941. In the interval she became ill and pregnant so that she is alleged to have been unable to travel. She was advised that should she be interned the consequences to her and to her unborn child might be fatal. Because of all these things, in accordance with the suggestions made to her, she applied for a Certificate of French Nationality. She allegedly did not read the application, nor was it read to her, and she had no knowledge of its contents. On September 8, 1941 she was issued such certificate.

In the fall of 1941 she returned to Paris. On December 2, 1941 she entered a hospital there and gave birth to a child that day. The child died December 5, 1941.

As soon as the United States Embassy was reopened in Paris, appellant requested that her American passport be revalidated. This was refused and on December 3, 1945 her passport was cancelled. On February 23, 1946 a Certificate of the Loss of the Nationality of the United States was issued regarding the appellant. The basis of this was that she had been naturalized as a French citizen.

Appellant then averred "that she had no voluntary intention of renouncing her American nationality and only applied for French nationality under such circumstances as amounted to duress and believing that upon the conclusion of hostilities her war time act would be considered a nullity."

We are here solely concerned with whether the complaint sets out a cause of action. We think it does. The pertinent part of Section 903 of the Nationalization Act under which this suit is brought reads: "If any person who claims a right or privilege as a national of the United States is denied such right or privilege by any Department or agency, or executive official thereof, upon the ground that he is not a national of the United States, such person, regardless of whether he is within the United States or abroad, may institute an action against the head of such Department

or agency in the District Court of the United States for the District of Columbia or in the district court of the United States for the district in which such person claims a permanent residence for a judgment declaring him to be a national of the United States."

Section 401 of the same Act, 54 Stat. 1168, 8 U.S.C.A. § 801, sets out the "General means of losing United States nationality", and the first of these, urged as controlling, states: "(a) Obtaining naturalization in a foreign state, either upon his own application or through the naturalization of a parent having legal custody of such person: * * *."

■ It is true that duress is nowhere mentioned in the Act in connection with subdivision (a) or the other subdivisions as a reason for exemption from their provisions. But the very essence of expatriation is that it be voluntary and, at least from the time of the decision of the United States Supreme Court in Perkins v. Elg, 307 U.S. 325, at page 343, 59 S.Ct. 884, at page 893, 83 L.Ed. 1320, there can be no real doubt that, as Chief Justice Hughes says in that case, "the statute was aimed at a voluntary expatriation." At page 334 in that opinion in 307 U.S., at page 889 of 59 S.Ct. appears the oft quoted language, "Expatriation is the voluntary renunciation or abandonment of nationality and allegiance."

In Dos Reis ex rel. Camara v. Nicolls, D.C.Mass., 68 F.Supp. 773, 776, the District Court considered it significant that the word "expatriate" used in the 1907 Act, 34 Stat. 1228, which was the one under scrutiny in the Perkins case and which was the predecessor of the 1940 Act, had been replaced by language reading, "A person who is a national of the United States * * * shall lose his nationality by * * * *". As a result the conclusion was reached that "a person can lose his American nationality by any of the means mentioned in Section 401, whether such act or acts be voluntary or involuntary." That decision involved subsection (c) which provides for loss of American nationality by a United States national "Entering, or serving in, the armed forces of a foreign

state unless expressly authorized by the laws of the United States, * * *." The Circuit Court of Appeals for the First Circuit in reversing the court below held that "the correct view" is that Section 401 (c), properly construed, is to be limited to cases where the induction into the foreign military service may be said to have been voluntary. 161 F.2d 860, 861.

Attorney General of the United States v. Ricketts, 9 Cir., 165 F.2d 193, 194, was a suit to obtain a judgment declaring plaintiff to be a national of the United States. Subsection (a) was urged against the application. The District Court, upholding plaintiff's contention, found that he "did not by his own voluntary act expatriate himself, but to the contrary has continuously asserted his claim of United States citizenship." On appeal, in affirming the district judge, the court said, "The decisive question here is whether there is substantial evidentiary support for the finding quoted above, namely, that appellee did not by his own voluntary act expatriate himself. The Attorney General insists that prior to appellee's entry into the United States for permanent residence he was shown to have elected to become a Canadian national."

There are two district court decisions involving facts comparable to the matter before us, Dubonnet v. Marshall, D.C.D.C. 80 F.Supp. 905 and Schioler v. United States, D.C.N.D.Ill., 75 F.Supp. 353, 355. In the Dubonnet case plaintiff's action was also under Section 903. She alleged she was an American born United States citizen who had married in France in 1937. In 1939 her husband enlisted and served with the French Air Force until the surrender of France in 1940. In 1941 plaintiff was a member of the French Resistance, and after the United States declared war she continued her work as a French national. In 1943 the French police warned her she had been denounced to the Germans as an American with false French identity cards, and the police advised her to accept the protection French citizenship could afford her. Believing her life was in danger, she applied for French citizenship which was granted. She alleged these were the reasons for her application: that it was mere-

724

ly to deceive the Germans and that she did not intend to renounce her United States nationality. When the American Embassy reopened in Paris she requested that her American passport be revalidated. This was refused and later a Certificate of the Loss of Nationality was issued regarding her. The government moved to dismiss the complaint on the ground that it did not state a cause of action. The court denied the motion "without prejudice to defendant's relying on said motion at the final hearing * * *." The issue was thereafter tried on the merits. The District Court in an opinion filed June 11, 1948 held that duress had not been shown and dismissed the action. The case, at the date of this opinion, is before the court on a motion for a new trial.

The Schioler litigation also arose out of the late war. There an American national had obtained Danish citizenship and in a declaratory judgment proceeding sought to regain her United States citizenship. The court in its opinion said: "In the instant case everything done by petitioner was done under the compulsion of fear for the safety of herself, her husband and their children, and in the interest of preserving their very lives when they found themselves during World War II in a country occupied by and virtually in command of the Germans. I do not believe that this is the free and voluntary renunciation of plaintiff's American citizenship which I think the statute contemplates."

And see In the Matter of Andrew Gogal, D.C.W.D.Pa., 75 F.Supp. 268; United States ex rel. Fracassi v. Karnuth, D.C. W.D.N.Y., 19 F.Supp. 581; McCampbell v. McCampbell, D.C.W.D.Ky., 13 F.Supp. 847; Yuichi Inouye v. Clark, D.C.S.D. Cal., 73 F.Supp. 1000. No case has been called to our attention nor have we found any which holds that duress is not a defense to the statute in question.

We think the rationale of the above decisions is sound. If by reason of extraordinary circumstances amounting to true duress, an American national is forced into the formalities of citizenship of another country, the sine qua non of expatriation is lacking. There is not authentic abandonment of his own nationality. His act,

if it can be called his act, is involuntary. He cannot be truly said to be manifesting an intention of renouncing his country. On the other hand it is just as certain that the forsaking of American citizenship, even in a difficult situation, as a matter of expediency, with attempted excuse of such conduct later when crass material considerations suggest that course, is not duress.

The government further argues that "even if duress required exemption from expatriation, the facts alleged by appellant, even if accepted as true do not amount in law to duress." That argument may ultimately prove correct, but at this time it is premature. The specific allegations of the complaint, as already stated, are that appellant had no voluntary intention of renouncing her American nationality and only applied for French nationality under such circumstances as amounted to duress. A framework of facts is presented in support of that statement. Whether that background as developed at a trial will actually constitute the type of proof necessary to establish duress under all the circumstances cannot be fairly foretold at this stage of the proceedings. Appellant has not as yet had the opportunity of justifying her complaint by proofs. Duress as we see it is a defense to expatriation. Appellant has pleaded it and should have her day in court to substantiate it, if she can.

The judgment of the District Court will be reversed and the case remanded for further proceedings not inconsistent with this opinion.

O'CONNELL, Circuit Judge (dissenting).

Unlike my brethren, I find it unnecessary to pass upon the question whether status as a national of the United States can be lost as the result of an act induced by duress. Assuming that expatriation would not result if duress were present, and assuming further the truth of the facts alleged in the instant complaint, I think the complaint nevertheless fails to assert circumstances warranting a conclusion that duress can be said to have existed here.

By her own admission, plaintiff in January, 1941, was advised by an American

consul to "leave France and return to the United States if possible." She does not allege, nor can it be fairly assumed, that physical or other difficulties prevented her at that time, or within a reasonable period thereafter, from leaving France as suggested.[1] Instead, she went to the south of France "with the intention of returning to the United States" at some unspecified time in the future.

Her assigned reason for applying for Vichy nationality papers was her alarm for her own safety and that of her unborn child, and also her inability to travel; but she nowhere states or fairly implies that anyone purporting to act in an official capacity for the United States, Vichy, Germany, or any other government instructed her to make such application; nor does she allege that an "apply-or-else" threat had been made to her by anyone.[2]

While she professes to have had "no knowledge of the contents" of the application she executed, she avers neither that she was ignorant of the purpose or effect of that application, nor that opportunity to examine it was denied her in any way; and she makes no similar disavowals concerning the Vichy certificate of nationality which was issued to her almost three months before the child was born and the United States entered the war. Further, she fails to state that, at any time subsequent to the issue of the Vichy certificate, even unto the day this complaint was filed, she has renounced the nationality granted therein, or has ever taken steps inimical to the interests of the Vichy government.

The transcript of the hearing in the court below makes clear that the basis for dismissal was plaintiff's failure to allege facts sufficient to establish duress. The foregoing recital of inadequacies I find with the complaint impels me to the same conclusion as that of the district judge. I believe that fear of possible internment, months before Pearl Harbor, and readily avoidable had the American consul's advice been heeded, is not sufficient grounds for obtaining and retaining naturalization from a government actively cooperating with the Axis powers. It seems to me apparent that the action which appellant alleges she feared was one which a government in an alliance against the United States had the legal power to inflict upon her, and consequently would scarcely amount to duress. Although the alternatives confronting her were not appetizing, I think it can hardly be said that her deliberate choice of a course immediately favoring her comfort or security, when the dilemma was of her own making and when she permitted years to lapse without repudiating by word or by deed the Vichy nationality, constituted duress. I know of no decision to the contrary.

I think the statute here in question could and did proclaim the expatriation of appellant by virtue of her voluntary application for, and acceptance of, Vichy nationality in preference to returning to the United States or remaining subject to the same risks as the thousands of other United States nationals abroad.[3] Accordingly, on the basis of the facts stated on the face of the complaint, I would affirm the judgment of dismissal.

---

[1] Plaintiff's child was born more than ten months later. According to her complaint, she became pregnant "in the interval between leaving Paris and the reissuance of her American passport," the latter date being May 26, 1941.

[2] The complaint reads, " * * * Plaintiff applied in accordance with the suggestions made to her * * *." It seems to me that we cannot spell a threat out of the word "suggestions," particularly when the identity of the suggester remains undisclosed.

[3] Cf. Mackenzie v. Hare, 1915, 239 U. S. 299, 36 S.Ct. 106, 60 L.Ed. 297, Ann. Cas.1916E, 645 on the extent of the Congessional power.