## ETSUKO ARIKAWA v. ACHESON.
## MIYOKO TSUNASHIMA v. ACHESON.
### Nos. 7973–WM, 8014–WM.

United States District Court
S. D. California, Central Division.
April 4, 1949.

474

Wirin, Kido & Okrand, of Los Angeles, Cal., for plaintiff.

James M. Carter, U. S. Atty., Clyde C. Downing, and Arline Martin, Asst. U. S. Attys., all of Los Angeles, Cal., for defendant.

CAVANAH, District Judge.

These two cases were consolidated for trial and the record relates to both of them with the additional contention and testimony presented in the Tsunashima case upon the question of duress, coercion, mistake, influence, and the lack of free exercise of will power and intelligent choice.

The plaintiffs, being citizens of the United States, bring these actions against the Secretary of the United States for a decree adjudging that they are still citizens and nationals of the United States, and are entitled to the rights and privileges of a national of the United States which entitles them to a passport returning to the United States from Japan. The defendant asserts they are not, and urges that they lost their claim of citizenship and nationality of the United States by reason of voting in a political election in a foreign state under the provisions of the Nationality Act of 1940, being Section 801(e), Title 8, United States Code, Annotated, which provides that, "A person who is a national of the United States, whether by birth or naturalization, shall lose his nationality by: (e) Voting in a political election in a foreign state or participating in an election or plebiscite to determine the sovereignty over foreign territory". This is one of the principal questions presented.

The plaintiffs urge that this statute does not apply to them under the uncontradicted evidence as disclosed by the record, since each case in which an attempt is made to invoke the statute should rest upon its own particular state of facts before one should forfeit his citizenship. There does not seem to be a controversy over what the facts are, but the contest is over the scope of them, and whether they take the act of the plaintiffs, when voting in Japan, out of the operation and application of the statute.

The plaintiffs were born in the state of California, which they have always claimed to be their permanent residence. While minors they were taken by their parents to visit Japan, and while there, it was determined by their parents that they should receive some education in Japan. They remained there temporarily for that purpose, and their parents returned to the United States and now reside in the state of California.

In December, 1941, upon the declaration of war between the United States and Japan, they found themselves, against their will and consent, stranded in Japan and, because of war conditions they were unable to return to the United States as they had intended, planned and expected to do. In 1946 an election was held in Japan at which they, as did other American-born citizens of Japanese descent, voted.

The first thought then to be considered, is: Should Japan be considered, at the time the election was ordered and held, a "foreign state", under the evidence in the present cases as contemplated by the statute? The defendant urges that it was, as the Allies were exercising independent authority, power, control, and sovereignty over Japan at the time the election was ordered and held, and therefore it was a "foreign state".

The primary inquiry first then is, under the particular facts in the present cases, was that the correct situation? After careful study of the record here, one can only answer this question in the negative, for it clearly reflects that the Allies recognized and completely transferred by their own act, supreme, full power and independent authority over Japan at the time of Japan's surrender, to the United States, to occupy and administer the kind of government Japan should have, and over the activities of the Japanese people. The record presents undisputed evidence, both oral and documentary, of the acts of those representing the United States. General MacArthur, then one of the Generals in the United States Army, was appointed by the United States Government as "Commander-in-Chief" in Japan, which the Allies never questioned, prior to and at the time the election was held. When

Japan surrendered the Allies ordained that the full power and independent authority to remain in Japan was vested in the United States to direct supreme authority in the establishment of a government there, and over the activities of its people. The United States, with that supreme and full power and authority, ordered and supervised the election with the view of establishing in Japan a democratic self-government to conform to the principles of the Constitution of the United States. Assuming that responsibility, the United States then realized and still, realizes that, in doing so, it was a benefit to it and to the world to establish in Japan a democratic form of government, and to educate the Japanese people to refrain in the future from any warlike tendencies. The government of the United States was, in fact, operating there at the time it ordered the election to be held, with full power to direct the manner in which it should be held, and to set aside or modify the result thereof if its Commander-in-Chief so decided, and he did modify the result of one of the elections. Some of the Allies were not concerned with a democratic form of government for Japan. There can be no question, under the evidence, but that the Allies conferred upon the United States supreme and independent power and authority to order and supervise the election in question. The American Commander-in-Chief for the first time conferred upon the women of Japan the right to vote, which was urged by him and by the press. He seems to have been interested in getting the women out to vote. The plaintiffs, American citizens, were there in an atmosphere where a General of the United States and Commander-in-Chief was appealing to all women to vote. They said they voted because he requested all women to vote, and that is what influenced them to do so. If they, in good faith and believing that as American citizens they should vote after the Commander-in-Chief with full authority had appealed to all women to vote, did so, then they voted not with intent to adopt allegiance to Japan, but because it was natural for young Japanese girls about twenty years of age whose permanent residence and citizenship were in the United States to be in a state of mind to vote after an American General Commander-in-Chief with supreme authority had appealed to them to do so. Manifestly, under such admitted circumstances, it would be unjust to say they were acting of a free mind and of their own intelligent choice. The fundamental principle of law is applicable as to influence, mistake and confusion existing which dominated the mind in not acting freely and voluntarily at the time. Inouye v. Clark, D.C., 73 F.Supp. 1000; Doreau v. Marshall, Secretary of State, 3 Cir., 170 F.2d 721; Schioler v. United States, 75 F.Supp. 353.

▮ It will be remembered that the election was conducted by the United States for its own purposes to have persons in the Legislature responsive to it to see through the adoption of a new Constitution, and to enact laws ordered by the United States; such is not the type of election contemplated by Congress in enacting the statutes, and so the record forces us to the consideration of the primary thought to be considered in interpreting the expression, "foreign state", and requires a determination of what constitutes a "foreign state", within Section 801(e).

▮ Mr. Chief Justice Marshall defines it to be one exclusively within the sovereignty of a foreign nation, and without the sovereignty of the United States. Cherokee Nation v. Georgia, 5 Pet. 1, 8 L.Ed. 25. The foreign nation must be independent and not governed by another. A nation which exercises its own will or judgment without the guidance or control of another. Japan in fact was under the authority and supreme power conferred upon the United States by the Allies, who delegated to the United States supreme independent authority, power and control over Japan prior to and at the time of the election, and who conceived, ordered and supervised it. It was clearly nothing more, under the evidence, than a supreme and independent act of the United States Government, and does not reach or come under the statute relating to a "foreign state".

The defendant relies upon the case of Savargnan v. United States, 7 Cir., 171 F. 2d 155, as defining what is a "foreign

state", but it is apparent after considering the facts of that case, that it is not applicable here. The distinction between the cases is plain. The evidence upon which the court based its conclusion in that case involved nationalization in a foreign state and taking an oath of allegiance to a foreign state, and affirmatively renouncing allegiance to one's former country of allegiance. In voting in the kind of election held in Japan in 1946 one may do so without thus inherently and necessarily intending to exercise a shift of allegiance. The case of Burnet, Commissioner of Internal Revenue v. Chicago Portrait Company, 285 U.S. 111, 52 S.Ct. 275, 76 L.Ed. 587, also relied upon by the defendant, does not apply since the facts there are not as broad as here, for there a tax was imposed by the authority of a foreign country to whom it was paid. There was no question but that New South Wales levied the income tax for which credit was sought and that government had adequate authority to impose the tax.

The further case relied upon by the defendant, Brunell v. United States, D.C., 77 F.Supp. 68, is lacking in that the facts are not as broad as here. The plaintiff, a professional entertainer, and citizen of the state of New York, residing in the district, alleged that she was lawfully touring in Saipan with a camp show and while there was injured by the American armed forces which did not have sovereignty as the United States did here.

■ The conclusion thus reached, that Japan was not a "foreign state", applies also under the record to the case of Tsunashima who, with the additional contention, she asserts, that when voting she did so under duress, coercion and intimidation, and not of a voluntary free and intelligent choice, which comes under the principle announced by this court in the case of Inouye v. Clark, D.C., 73 F.Supp. 1000, 1004. The uncontradicted testimony discloses that on the election day she refused to vote several times, and was finally informed by an officer of the city that unless she voted her food rations would be discontinued. She says rather than go without a ration book and food for herself and grandmother, she yielded and voted.

The facts are clear that she voted under duress, coercion and intimidation which dominated her mind in that she could not fully and voluntarily act at the time she voted. It was not the result of a free and intelligent choice.

The conclusion is thus reached in both of the above cases that the plaintiffs are each granted a decree adjudging that each of them is a citizen and national of the United States and, as such, entitled to the rights and the privileges of a national of the United States, including a passport, in order to return to the United States.

Counsel for the plaintiff will prepare and present Findings and Decrees in each of the above cases.